Argued October 26, reversed and remanded November 17, 1971

## NORTH UNIT POTATO CO., *Respondent, v.* SPADA DISTRIBUTING CO., INC., *Appellant.*

### 490 P2d 995

*Curtis W. Cutsforth,* Portland, argued the cause for appellant. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, Portland, and Cash R. Perrine, Bend.

*Douglas A. Shepard,* Madras, argued the cause and filed a brief for respondent.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON,[*] Justices.

TONGUE, J.

This is an action to recover $7,904.82 in storage charges for potatoes stored in plaintiff's warehouse in Metolius, Oregon. The defendants include the

---

[*] Bryson, J., did not participate in this decision.

owner of the potatoes, who entered no defense, and the corporation which financed the owner and which packed and shipped the potatoes for the owner's account. The trial court, sitting without a jury, awarded judgment against both defendants. Defendant Spada Distributing Co., Inc. (Spada) appeals.

The basis for the judgment by the trial court was its finding that defendant Gabbard, the owner, made a contract with Spada "for the payment of storage charges 'in the usual manner' and the record is replete with testimony that the custom prevailing in the industry is for the payment of storage charges with the same priority as grading and other crop preparation costs."

In the spring of 1969, the defendant Gabbard needed financing for a potato crop. On or about May 13, 1969, Gabbard and defendant entered into a written agreement for that purpose. That agreement provided that Spada would advance to Gabbard $40,000 in cash and would guarantee an additional $12,000 for fertilizer to be purchased by Gabbard from Pacific Supply cooperative. In consideration, Gabbard agreed to sell all the potatoes raised on the premises described in the agreement through defendant and that in the event any of such potatoes were not sold through defendant, to pay defendant $5 per ton, "field run" for the potatoes.

Gabbard also agreed to pay defendant for all potatoes packed or processed in its plant the standard grading charge, necessary inspection charges, and a merchandising charge depending upon the sales price of the potatoes, as well as interest on the advances made by defendant.

Concurrently with the execution of that agree-

ment, Gabbard and his wife executed a promissory note in favor of Spada for the amount of the advances, a UCC financing statement and a UCC security agreement.

Gabbard then proceeded to plant, grow and harvest his potato crop. The moneys which Spada had undertaken to advance to Gabbard were advanced and were used by him in his farming operation.

Gabbard was also a one-fourth owner and vice president of plaintiff corporation, which owns and operates a warehouse for the storage of potatoes, including space reserved for the storage of potatoes owned by Gabbard, as one of its stockholders. With the knowledge and approval of Spada, Gabbard elected to store the potatoes in plaintiff's warehouse, for subsequent transfer to Spada's plant for packing and shipping. Accordingly, Gabbard made arrangements with plaintiff for the storage of the potatoes. Spada had nothing to do with the making of those arrangements.

Thereafter, commencing in November 1969, and continuing until May 1970, Gabbard's potatoes were hauled by Spada from plaintiff's warehouse to defendant's plant for packing and shipment. On December 16, 1969, plaintiff notified Spada that storage of $3 per ton on Gabbard's potatoes was "payable" to plaintiff. Later Gabbard told Spada that he wanted the check for storage charges made payable to both himself and plaintiff.

Defendant Spada then proceeded to grade, pack, sell and ship Gabbard's potatoes. Out of the proceeds from the sales of the potatoes, defendant retained the grading and marketing charges specified in the agreement, together with the amount of the advances

previously made to Gabbard, with interest. Defendant did not, however, pay out of the sales proceeds plaintiff's storage charges, as well as claims by three other creditors of Gabbard, because the balance remaining was not sufficient to cover them all. Instead, Spada made out a single check representing the balance, in the sum of $5,582.62, payable jointly to Gabbard and to all of such claimants, and sent that check to Gabbard.

Plaintiff contends that the trial court was correct in entering judgment against both defendants for the amount of the storage charges and that the findings and conclusions of the trial court must be affirmed if there is any substantial evidence to support them. More specifically, plaintiff contends that it was the custom in the potato industry in Central Oregon for shippers to pay storage charges, as well as other charges incurred in preparing the potatoes for market, and to deduct such charges in arriving at a net amount payable to the grower and his lender. Plaintiff also contends that Gabbard, the grower, and defendant Spada, the lender, "agreed in the usual course for payment of storage charges by Spada to plaintiff"; that plaintiff requested Spada to pay such charges; that "this case does not present the problem of determining priorities between a prior secured creditor and a subsequent unsecured one," but that "rather it is the interpretation of the contract as it is affected by a custom or valid usage of the trade that is the issue." Finally, plaintiff contends that it is entitled to the benefit of Gabbard's agreement with Spada, either as a third party beneficiary of that contract or upon the theory that there was a joint venture between Gabbard and Spada.

Defendant Spada contends, to the contrary, that it made no agreement to pay plaintiff's storage

charges and that the only contract entered into by it was the written contract with Gabbard, which made no reference to payment of storage charges. Spada also contends that the evidence of custom is insufficient to establish an obligation by it to pay plaintiff's storage charges in preference to Gabbard's obligations to it, both (a) because there was no evidence that any such custom would apply when there were insufficient funds to pay all of such charges, and (b) because evidence of custom is available only as a means of interpretation of a contract and cannot be used to contradict or qualify its provisions. Spada also denies that plaintiff's theories of third party beneficiary or joint venture have any validity.

1. *There was no evidence that Spada agreed "in the usual course" for payment of plaintiff's storage charges.*

■ If, as contended by plaintiff, there had been an agreement between Spada and Gabbard under which Spada agreed, "in the usual course" to pay plaintiff's storage charges, or to pay such charges "in the usual manner" (as found by the trial court), such an agreement might be subject to "interpretation" by evidence of custom relating to the payment of such charges. Upon examination of the record in this case, however, we find no substantial evidence to support such a finding.

The original written contract between Gabbard and Spada makes no reference to storage charges. Indeed, the reference in that agreement to pay charges for fertilizer is evidence of an intent that Spada did not undertake or agree to pay any other charges or claims by any other third parties.

Neither is such an agreement established by the evidence that Gabbard informed Spada of his desire to store his potatoes in plaintiff's warehouse, in which Gabbard owned a one-fourth interest, and that Spada told him that it had no objection to such an arrangement.

The only other evidence of any discussions with Spada on this subject was that after the potatoes had been stored at plaintiff's warehouse and after at least some of them had been transferred to Spada's plant for packing and shipment, both plaintiff and Gabbard requested Spada to pay plaintiff's storage charges. According to the testimony, however, while Spada did not at first say that it would not pay such charges, neither did it ever agree to do so.

But even if it may be possible to infer from Spada's knowledge that Gabbard had stored his potatoes at plaintiff's warehouse that Spada would pay plaintiff's storage charges if there were sufficient funds from the sale of the potatoes to do so, there is no evidence in the record sufficient to support an inference that Spada agreed either to pay plaintiff's storage charges in the absence of such sufficient funds or that Spada agreed "in the usual course" to pay plaintiff's storage charges, or to pay such charges "in the usual manner."

2. *There was no evidence that the custom for payment of storage charges extended to payment of such charges when there were insufficient funds to do so.*

■ Plaintiff offered the testimony of several witnesses to the effect that in Central Oregon a custom exists under which the shippers of potatoes pay storage and other similar charges before computing the net amount payable to a grower on the sale of his

potatoes, including payment for "outside" storage charges when requested to do so by the grower.

These witnesses admitted on cross-examination, however, that they knew of no custom for the payment of such charges by the shipper from his own funds when there were not sufficient funds from the sale of the potatoes for payment of such charges. Two of the witnesses said that there were instances in which the shipper had to "make it up" or in which there was not enough money left for the "lender."

3. *Evidence of custom cannot be used to contradict the terms of a written contract.*

Even if it be assumed, however, that the evidence of custom offered in this case was sufficient to establish a custom under which the shipper of potatoes was required to pay storage and other charges in all cases, including cases in which the funds received from the sale of the potatoes were not sufficient for payment of such charges and in which the shipper was also the lender, as in this case, the same result must nevertheless follow in this case.

In Oregon it is provided by statute that evidence of custom or usage "* * * is never admissible except as a means of interpretation." ORS 41.900 (12). Accordingly, it has often been held by this court that evidence of a custom inconsistent with the terms of a written agreement is not admissible to contradict the terms of an unambiguous contract and that evidence of custom is also inadmissible to add to the terms of such a contract. Among the many decisions to that effect, see *Bliss v. Southern Pacific Co. et al*, 212 Or 634, 640, 321 P2d 324 (1958); *Smith v. Abel et al*, 211 Or 571, 593, 316 P2d 793 (1957); *Smith v. Laflar*, 137 Or 230, 233, 2 P2d 18 (1931).

It has been stated, however, that evidence of custom may be admissible when a written contract is silent on some subject, such as an incidental matter or detail necessary to the performance of the contract, if not inconsistent with the terms of the written contract. See, for example, *Simms v. Sullivan,* 100 Or 487, 492, 198 P 240 (1921); *Hurst v. Larson,* 94 Or 211, 214, 184 P 258 (1919); *Savage v. Salem Mills Co.,* 48 Or 1, 11, 85 P 69 (1906). See also *Montgomery v. U. S. Nat'l Bank et al,* 220 Or 553, 565, 567, 349 P2d 464 (1960), and 5 Williston on Contracts 1-6, § 648 (3d ed 1961).

For other cases involving contracts for the sale or storage of wheat or other commodities in which evidence of custom was rejected, see *Montgomery v. U. S. Nat'l Bank et al, supra; Interior Warehouse Co. v. Dunn,* 80 Or 528, 535, 157 P 806 (1916); *Barnard & Bunker v. Houser,* 68 Or 240, 243, 137 P 227 (1913); *Holmes v. Whitaker,* 23 Or 319, 324, 31 P 705 (1892); and *McCulsky v. Klosterman,* 20 Or 108, 115-17, 25 P 366 (1890). See also *Darling-Singer Lbr. Co. v. Oriental Nav. Co.,* 127 Or 655, 671-72, 259 P 420, 272 P 275 (1928). For contrary holdings, under different facts, see *Hurst v. Larson, supra,* and *Savage v. Salem Mills Co., supra.*

In this case the original written contract between Gabbard and Spada for the advancement of funds by Spada to Gabbard, including provisions for payment of grading and inspection charges, said nothing about payment of storage charges. That, however, was not the only written contract between the parties. In addition, Gabbard signed a note, a UCC financing statement and a UCC security agreement.

After examining the terms of these agreements,

which are not claimed to be ambiguous in any way, and after considering the clear purpose of these agreements to confer upon defendant Spada security for the repayment of all advances made by it to Gabbard, we have reached the conclusion that to give effect to the evidence of custom in the manner and to the extent contended by plaintiff would not only be inconsistent with the terms of the written agreements between Gabbard and Spada, but would "override the manifest intention of the parties to the contract." Cf. *Port Invest. Co. v. Oregon M.F. Ins. Co.*, 163 Or 1, 18, 94 P2d 734 (1939).

It may be that evidence of custom to pay storage charges could be said to supplement that contract to the extent that such payments could be made in such a manner and with such effect as not to contradict the terms of the written contract (i.e., if Spada held sufficient funds from the proceeds of the potatoes from which such charges could be paid). But to apply and enforce such a custom in this manner with the effect of requiring Spada to pay such charges from its own funds and so as to impair its security interest as a means of enforcing payment of all advances and charges made by Spada, would be to contradict the express provisions of its written agreements with Gabbard.

Because of this basis for the decision of this case, it is not necessary to consider the further issues of joint venture and third party beneficiary. Accordingly, the judgment of the trial court is reversed and the case is remanded with instructions that it be dismissed.

Reversed and remanded with instructions.