Argued September 6, affirmed December 12, 1974, petition for re-
hearing denied January 3, motion for stay of mandate and super-
sedeus allowed January 14, 1975. Petition for certiorari
Supreme Court of U. S. denied June 9, 1975

GILSTRAP ET AL, *Respondents-Cross-Appellants,*
*v.* MITCHELL BROS. TRUCK LINES,
*Appellant-Cross-Respondent.*
529 P2d 370

600

*Alex L. Parks,* Portland, argued the cause for appellant and cross-respondent. With him on the briefs were Russell M. Allen, and White, Sutherland, Parks & Heath, Portland.

*Roger G. Tilbury,* Portland, argued the cause for respondents and cross-appellants. With him on the brief was Howard Hilson of Ransom, Hilson & Eder, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL, BRYSON, and SLOPER, Justices.

HOWELL, J.

This is an action at law in which plaintiffs, owner-operators of commercial trucks, seek money damages for breach of certain lease agreements with defendant Mitchell Bros. Truck Lines. Specifically, plaintiffs seek to recover federal highway use taxes and federal fuel taxes which were incurred in the operation of their trucks. They also seek to recover safety bonuses and permit load bonuses which they allege defendant orally agreed to pay. The case was tried before the court and a judgment entered for the plaintiffs on the highway use and fuel taxes and for the defendant on the safety and permit load bonuses. Defendant appeals and plaintiffs cross appeal.

Defendant is a truck line operating in interstate commerce. For a number of years it has entered into lease agreements with owner-operators of trucks whereby the truck was leased to Mitchell Bros. and the owner-operator was employed as a driver. The owner-operator was to receive two checks: one for truck rental and one for payroll.

The legal relationship between the defendant and the plaintiffs is complex. Under the standardized lease agreements prepared by the defendant, defend-

ant agreed to lease plaintiffs' trucks at a certain rate per mile and to place plaintiffs on its payroll as drivers. The lease also contained the following provision:

"4. Lessee agrees to assume full responsibility for the equipment leased while the same is in Lessee's possession, said responsibility to include * * * *highway use taxes,* mileage fees; tolls and State regulatory permits." (Emphasis added.)

Defendant, a member of the Oregon Draymens Association, and plaintiffs, members of the Teamsters Union, are also subject to a collective bargaining agreement entered into by the union and the association. Article XXXI of that agreement specifically covers owner-operators. Section 10 of that article provides:

"Expenses to Be Paid by Employer.

"The Employer or certificated or permitted carrier hereby agrees to pay road or mile tax, social security tax, compensation insurance, public liability and property damage insurance, bridge toll, fees for certificates, permits and travel orders, fines and penalties for inadequate certificates, license fees, weight tax and wheel tax, and for loss of driving time due to waiting at State lines, and also cargo insurance. It is expressly understood that the owner-driver shall pay the license fees in the State in which title is registered.

"All tolls, no matter how computed, must be paid by the Employer regardless of any agreement to the contrary.

"*All taxes or additional charges imposed by law relating to actual truck operation and use of highways, no matter how computed or named, shall be paid by the carrier,* excepting only vehicle licensing as such, in the State where title is registered." (Emphasis added.)

Plaintiffs also contend that, at a meeting on July 12, 1969, defendant orally agreed to pay plaintiffs three-fourths of a cent per mile safety bonus annually and three and one-third cents per mile for permit load hauling.[1] Defendant asserts that the plaintiffs failed to come within the required conditions to receive the safety bonus and that no agreement with regard to the permit load bonus was reached.

In summary, plaintiffs are asserting rights based on the lease, the collective bargaining agreement, and oral promises allegedly made at the July 12 meeting.

Prior to reaching the merits of plaintiffs' claims, we are presented with a jurisdictional question raised by defendant's plea in abatement.[2] All parties to this dispute were subject to the collective bargaining agreement, including the mandatory grievance procedures therein. Defendant contends that the plaintiffs as owner-operators were required, under the terms of the agreement, to submit any and all disputes or controversies arising out of the agreement

---

[1] The safety bonus consisted of a bonus of three-fourths of a cent per mile driven by a driver in a one-year period, provided the driver did not have claims charged to him that aggregated more than $250 in the period. A permit load bonus consists of a bonus paid when the driver's load is too long, wide or high for normal travel, and a special state permit is required. This permit usually restricts the driver to daylight travel and to travel at a lower speed.

[2] The jurisdictional question was actually raised in defendant's answer as an affirmative defense. The court held that the affirmative defense actually constituted a plea in abatement. With the consent of all parties it was treated as such and a hearing on it was held prior to the trial on the merits. *See* Wagner v. Columbia Hospital Dist., 259 Or 15, 485 P2d 421 (1971).

to those mandatory grievance procedures.[9] Defendant argues that plaintiffs have failed to exhaust these mandatory grievance procedures and thus the circuit court was without jurisdiction to hear this case.

■ In essence, the defendant alleges that the plaintiffs have breached their collective bargaining agreement by failing to submit to the grievance procedures and thus are barred from seeking recourse in the courts. In *Textile Workers v. Lincoln Mills,* 353 US 448, 451, 77 S Ct 912, 1 L Ed 2d 972 (1957), the United States Supreme Court held that § 301 (a) of the Labor Management Relations Act of 1947, 29 USC § 185 (a) :[4]

"* * * authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements. * * *" 353 US at 451.

State courts have concurrent jurisdiction with federal courts in applying this "body of federal law." *William*

---

[9] Article XXXI of the collective bargaining agreement, specifically covering owner-operators, provides in part:

"Section 18.

Handling Grievances.

"(a) The use of individual owner-operators shall be permitted by all certificated or permitted carriers who will agree to submit all grievances pertaining to owner-operators to joint committee in this area. * * *"

[4] Section 301 (a) of the Labor Management Relations Act of 1947, 29 USC § 185 (a), reads:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

*E. Arnold Co. v. Carpenters District Council,* 417 US 12, 94 S Ct 2069, 40 L Ed 2d 620 (1974); *Dowd Box Co. v. Courtney,* 368 US 502, 82 S Ct 519, 7 L Ed 2d 483 (1962); *State ex rel Nilsen v. Berry,* 248 Or 391, 434 P2d 471 (1967).

■ The law is well settled that in the ordinary situation an employee who is subject to a collective bargaining agreement which contains mandatory grievance procedures must first look to those procedures as the vehicle for redress. One who fails to exhaust those procedures will find access to the courts barred. *Vaca v. Sipes,* 386 US 171, 87 S Ct 903, 17 L Ed 2d 842 (1967); *Republic Steel Corporation v. Maddox,* 379 US 650, 85 S Ct 614, 13 L Ed 2d 580 (1965); and *State ex rel Nilsen v. Berry,* supra.

In *Maddox* the court held that an Alabama state court was without jurisdiction to hear an action by a former employee for wrongful discharge where the employee made no effort to utilize the grievance procedures provided in the collective bargaining agreement.

> "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress. * * *" 379 US at 652. (Emphasis in original, footnote omitted.)

*Vaca* concerned an employee's action for damages against his union in which the employee alleged that the union failed to fairly represent him in the grievance procedure. In the course of its opinion the court reiterated the rule enunciated in *Maddox:*

> "* * * [I]f the wrongfully discharged employ-

ee himself resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exhaustive remedies provided by such a contract have not been exhausted. Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. * * *" 386 US at 184.

*Vaca,* however, recognized that the above stated rule is not to be applied universally but is subject to certain exceptions. "[B]ecause these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant." 386 US at 185.

■ The first exception which is relevant to this case arises when the union b r e a c h e s its duty of fair representation to the employee. *Vaca v. Sipes,* supra at 177, 185. Several years ago the United States Supreme Court imposed upon the unions a duty to fairly represent not only the union membership as a whole but also each individual within the group. *Steele v. L. & N. R. Co.,* 323 US 192, 65 S Ct 226, 89 L Ed 173 (1944). When the union breaches this duty the employee may seek judicial enforcement of his rights against the employer, and this is true although the employer did not participate in the breach. *Vaca v. Sipes,* supra at 185; *Schum v. South Buffalo Railway Co.,* 496 F2d 328, 331-332 (2d Cir 1974).

The standards to which a union is held are sum-

marized in *Griffin v. International U., United Automobile, A. & A.I.W.*, 469 F2d 181, 183 (4th Cir 1972):

"* * * A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action."

*See* Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex L Rev 1119 (1973).

■ A union may breach its duty of fair representation by arbitrarily refusing to press the employee's grievance or by handling it in a perfunctory manner. *De Arroyo v. Sindicato de Trabajadores Packinghouse,* 425 F2d 281 (1st Cir 1970), *cert. denied* 400 US 877, *reh. denied* 400 US 953, 401 US 926; *Griffin International U., United Automobile, A. & A.I.W.,* supra; *Smith v. Pittsburgh Gage and Supply Company,* 464 F2d 870 (3d Cir 1972). And one court has held that a union has violated its duty of representation when its handling of the employee's grievance was substandard. *Thompson v. International Association of Machinists,* 258 F Supp 235 (ED Va 1966).

"* * * [W]hen the union has chosen—or simply fallen into—a path of representation that is significantly inferior to an alternate path that would not have added substantially to the burden on the union's resources, the perfunctory-substandard test should apply and require the union to explain its choice. Cases such as *Thompson, deArroyo,* and *Griffin* seem to be moving toward placing the burden of convincing explanation on

the union." Bryson, *A Matter of Wooden Logic: Labor Law Preemption and Individual Rights,* 51 Tex L Rev 1037, 1102-03 (1973).

■ A number of well-reasoned decisions have also rejected the requirement that the union's conduct must be not only arbitrary but also in bad faith. *De Arroyo v. Sindicato de Trabajadores Packinghouse,* supra at 284. *See also Beriault v. Local 40, Super Cargoes & Check. of I.L. & W.U.,* 501 F2d 258 (9th Cir 1974), *reversing* 340 F Supp 155 (D Or 1972), and cases cited therein. We agree that a bad faith requirement unduly restricts the duty of fair representation.[5]

■ Although an individual employee does not have an absolute right to have his grievance taken through all the steps of the grievance procedures, he does have a right to demand that the union protect his rights in good faith and in a nonarbitrary manner. *Vaca v. Sipes,* supra at 194. *See also Thommen v. Consolidated Freightways,* 234 F Supp 472, 474 (D Or 1964) ; *Wagner v. Columbia Hospital Dist.,* 259 Or 15, 485 P2d 421 (1971).

A newer and less clearly defined exception to the duty to exhaust mandatory grievance procedures is the futility exception enunciated in *Glover v. St. Louis-S.F. R. Co.,* 393 US 324, 89 S Ct 548, 21 L Ed 2d 519

[5] "A bad-faith standard of fair representation cannot enforce the union's affirmative responsibilities. It can prohibit invidious distinctions like race and possibly sex, and it can inhibit deliberate attempts to sacrifice the rights of individual employees, but it cannot ensure that a union will offer minimal representation to all the employees it serves. In brief, a bad-faith standard allows unions to make unfounded decisions as long as there is no evidence of deliberate wrongdoing." Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex L Rev 1119 (1973).

(1969).⊛ In that case the plaintiffs brought an action against their employer and their union alleging that the employer and union acted in concert to bar negro employees from promotion wholly because of race. In discussing exhaustion of remedies, the court said:

"* * * The Court has made clear * * * that the exhaustion requirement is subject to a number of exceptions for the variety of situations in which doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy. * * *.

"* * * * * .

"The Court in Vaca went on to specify at least two situations in which suit could be brought by the employee despite his failure to exhaust fully his contractual remedies. The circumstances of the present case call into play another of the most obvious exceptions to the exhaustion requirement —the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile. * * *" 393 US at 329-30.

The facts in *Glover* indicate that the employees repeatedly had complained to the union and the employer, and their requests for action were either ignored or perfunctorily rejected. The court felt that it would be futile to require the employees to submit themselves "to any remedy administered by the union, by the company, or both, to pass on claims by the very employees whose rights they have been charged with

---

⊛ Due to the fact that the futility exception is so closely related to the breach of the duty of fair representation exception, some authorities feel that the author of *Glover*, Justice Black, may have merely been expanding on the duty of fair representation exception. *See* Local U. No. 90, A.F.G.W.U. v. American Flint Glass Wkrs.' U., 374 F Supp 600. (D Md 1974). *See also* Simpson and Berwick, *Exhaustion of Grievance Procedures and the Individual Employee*, 51 Tex L Rev 1179, 1210-213 (1973). The distinction as to whether *Glover* established a new exception or broadened an old one is of little practical importance.

neglecting and betraying." 393 US at 330-331. *See also Steele v. L. & N.R. Co., supra.*

It is true that a few courts have read *Glover* so restrictively as to limit it to suits alleging racial discrimination. *See e.g., Fulsom v. United-Buckingham Freight Lines, Inc.,* 324 F Supp 135, 137, n. 1 (WD Mo 1970), and *Bowen v. Lockheed-Georgia Company,* 309 F Supp 1210, 1215 (ND Ga 1970). And other courts have applied *Glover* primarily when there has been collusion between the union and the employer. *See e.g., Orphan v. Furnco Construction Corporation,* 466 F2d 795 (7th Cir 1972), and *Lusk v. Eastern Products Corporation,* 427 F2d 705 (4th Cir 1970).

We believe, however, that the better view is the one adhered to by the Ninth Circuit Court of Appeals. In *Retana v. Apartment, Motel, Hotel and El. Op. U., Loc. No. 14,* 453 F2d 1018 (9th Cir 1972), the court placed emphasis on the fact that the employees had made repeated requests to the union for redress of their grievances:

> "* * * Proof of appellant's allegations that she repeatedly solicited the union's assistance without result might excuse failure to exhaust internal union remedies on the ground that she reasonably believed further efforts to invoke such remedies would be futile." 453 F2d at 1027-1028.

*See also Seay v. McDonnell Douglas Corporation,* 427 F2d 996, 1001 (9th Cir 1970). *Accord, Smith v. Pittsburgh Gage and Supply Company,* 464 F2d 870 (3d Cir 1972); *Waters v. Wisconsin Steel Wks. of International Harvester Co.,* 427 F2d 476, 490 (7th Cir

1970), *cert. denied* 400 US 911; *Derr v. Bright,* 297 F Supp 12 (MD Pa 1969).[7]

■ In summary, the *Glover* futility exception should apply whenever the facts of the case indicate that an employee's grievance would not receive the fair consideration and good faith evaluation that is required in a mandatory grievance procedure.[8] *See Waters v. Wisconsin Steel Wks. of International Harvester Co.,* supra 427 F2d at 490; *Day v. United Automobile, Aero. & Agr. Imp. Wkrs., Local 36,* 466 F2d 83, 96 (6th Cir 1972); *de Arroyo v. Sindicata de Trabajadores Packinghouse,* supra 425 F2d at 283; *Wagner v. Columbia Hospital Dist.,* supra at 27-28. *See also* Simpson and Berwick, *Exhaustion of Grievance Procedures and the Individual Employee,* 51 Tex L Rev 1179, 1213.

■ Applying the above rules of law to the facts of the instant case, we believe the plaintiffs are excused

---

[7] The reasoning in these cases also finds support from language in *Glover:*

"* * * [T]he *attempt* to exhaust contractual remedies, required under Maddox [Republic Steel Corporation v. Maddox, 379 US 650, 85 S Ct 614, 13 L Ed 2d 580 (1965)] is easily satisfied by petitioners' repeated complaints to company and union officials, and no time-consuming formalities should be demanded of them. * * *" 393 US at 331 (Emphasis in original.)

Simpson and Berwick, supra n. 6, point out that:

"* * * Justice Black may well have inserted the attempt discussion — essentially surplusage — to encourage lower courts to view repeated importunities to union officials or to the employer as sufficient attempt. * * *" (Footnote omitted.)

[8] Another exception, clearly inapplicable to this case, exists where the employer repudiates the private grievance machinery or has engaged in other conduct which effectively estops him from relying on the unexhausted grievance procedures. Vaca v. Sipes, 386 US 171, 185, 87 S Ct 903, 17 L Ed 2d 842 (1967).

from exhausting the mandatory grievance procedures provided in the collective bargaining agreement.

Plaintiffs occupy a unique and apparently disadvantageous position in their relationship with the employer and the union. As employees of Mitchell Bros., they had the traditional benefits and responsibilities of union membership. However, they were also entrepreneurs who purchased and leased out their own equipment. In this sense they did not occupy a traditional employee role.

The leases in question were the sole product of negotiations between the plaintiffs and Mitchell Bros. There was no union participation. Indeed, although the collective bargaining agreement required that a copy of each lease be filed with the union, none in fact ever were. And, although the collective bargaining agreement specified certain mandatory language be included in all lease agreements,[9] these leases did not contain that language.

---

[9] "Section 19.

Mandatory Language for Agreements.

"All leases, agreements, or arrangements between carriers and owner-operators shall contain the following statement:

" 'The equipment which is the subject of this lease shall be driven by an employee of the lessee at all times that it is in the service of the lessee. If the lessor is hired as an employee to drive such equipment he shall receive as rental compensation for the use of such equipment no less than the minimum rental rates, allowances, and conditions (or the equivalent thereof as stated in the lease, and, in addition thereto, the full wage rate and supplementary allowances for drivers) or the equivalent thereof as approved by the Oregon Draymen and Warehousemen's Association.

" 'The lessee expressly reserves the right to control the manner, means and details of, and by which the driver of such leased equipment performs his services, as well as the ends to be accomplished. To the extent that any provision of this lease may conflict with the provisions of the

As noted above, the plaintiffs demand reimbursement for four items: federal highway use taxes, federal gasoline taxes, permit load bonuses, and safety bonuses. Prior to taking legal action, plaintiff Eldon Gilstrap, representing himself and other owner-operators, discussed each matter with the union representatives. According to his testimony, the union took the position that it lacked jurisdiction in the case as the plaintiffs and Mitchell Bros. had entered into their lease agreements without union participation.[10] This oft-stated position by the union led the owner-operators to the conclusion that the union "would protect us in the same fashion they did the company drivers, but so far as the trucks on lease with Mitchell Bros. is concerned, they won't, they would give us no protection on that."

The impression by the owner-operators that they would receive little or no protection from the union in

Oregon Draymen and Warehousemen's Association agreement as it applies to equipment driven by the owner, such provision of this lease shall be null and void and the provisions of such Agreement shall prevail.' "

[10] The facts in the case at hand are substantially similar to the fact situation in de Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F2d 281 (1st Cir 1970) *cert. denied* 400 US 877. In that case, as here, there was no evidence of actual bad faith on the part of the union. The union in *de Arroyo* refused to press the employee's grievance because of a mistaken belief that the employee's grievance would be covered by a prior NLRB determination involving other employees. The court pointed out that this belief was clearly erroneous. In the present case the union was laboring under a belief that, due to the fact that the leases were negotiated without union participation, the union was without jurisdiction. This, too, was clearly erroneous in light of Article XXXI, § 18, of the collective bargaining agreement which states:

"The use of individual owner-operators shall be permitted by all certificated or permitted carriers who will agree to submit all grievances pertaining to owner-operators to joint committee in this area. * * *"

enforcement of their leases was apparently correct. A letter of July 6, 1971, from the attorney for the union to plaintiffs' attorney, received into evidence without objection, read in part:

"It became obvious to all parties concerned that your clients had entered into individual lease agreements with Mitchell Bros. and did the same on their own initiative without any participation by our clients. Therefore, it would seem to us that your clients have embarked on an independent course of action separate and distinct from the union contract. * * *"

This letter was written after legal action against Mitchell Bros. was instituted. However, it is relevant to confirm Gilstrap's testimony with regard to the union's prior position.

Gilstrap's testimony received other stronger confirmation. Mr. Calvin Rogers, business agent for Local 162 of the Teamsters Union, was called by Mitchell Bros. as a defense witness. On cross-examination he was read the above-quoted portion of the July 6 letter. He agreed that the union took the position that plaintiffs, by entering into individual lease agreements at the request of Mitchell Bros., had embarked on an independent course of action separate and distinct from the union contract.

The plaintiffs did belatedly file grievance procedures after the institution of their action. There is conflicting testimony as to whether this grievance was later withdrawn by the plaintiffs. It appears that it would not have mattered whether plaintiffs withdrew their grievance in view of the union's position with regard to union members who employ out-

side counsel to represent them. On cross-examination Mr. Rogers was asked:

> "Q: Did I understand you to say when any of the drivers who are members of the Teamsters union employ outside counsel, for whatever reason, then it is the practice of the union, for whatever reason, not to proceed with any grievance proceedings?
>
> "A: That is correct.
>
> "Q: Has that been true for a number of years?
>
> "A: Yes, sir.
>
> "Q: What is the reason for that?
>
> "A: The reason for that is we feel they are exhausting their remedy in another fashion and it puts the local union in a very untenable position."

A hearing was held on defendant's plea in abatement that the plaintiffs had failed to exhaust the grievance procedures set forth in the collective bargaining agreement. From the foregoing facts it is clear that there was sufficient evidence to justify the trial court's ruling that the plaintiffs were entitled to a trial on the merits. First, the union failed to meet its duty to fairly represent the plaintiffs in their dispute with Mitchell Bros., and second, any recourse to the grievance procedures provided in the collective bargaining agreement would be wholly futile.

■ On the merits, the defendant contends that it is not liable to reimburse the owner-operators for federal fuel taxes and federal highway use taxes. It is important in this context to remember that all parties agree that both the plaintiffs and the defendant are subject not only to the provisions of the lease but also to the provisions of the collective bargaining agreement as it pertains to owner-operators.

Paragraph 4 of the lease agreement provided that the "Lessee agrees to assume full responsibility for * * * highway use taxes * * *." Article XXXI, § 10, of the collective bargaining agreement provides, in pertinent part:

> "*All taxes or additional charges imposed by law relating to actual truck operation and use of highways, no matter how computed or named, shall be paid by the carrier,* excepting only vehicle licensing as such, in the State where title is registered." (Emphasis added.)

In *Asbury Trans. v. Cons. Freightways,* 263 Or 53, 501 P2d 321 (1972), this court had occasion to interpret similar provisions. In that case both plaintiff and defendant were parties to a lease which contained the following:

> "4. LICENSE EXPENSE. The parties hereto shall bear and pay all fees for * * * *Federal Highway Use Tax or other road or mile taxes,* permits and travel orders, weight taxes and wheel taxes, fines, penalties and tolls, *in accordance with the collective bargaining* agreements, and any supplements thereto, to which reference is made in paragraph 10. [Emphasis supplied.]"

The collective bargaining agreement to which reference is made in *Asbury* provided:

> "*All taxes or additional charges imposed by law relating to actual truck operation and use of highways,* no matter how computed or named, *shall be paid by the Carrier,* excepting only vehicle licensing as such, in the state where title is registered." (Emphasis supplied.)

The court held:

> "Consequently, when the lease provides that the federal highway use tax and other road or mile taxes are to be paid according to the union agreement, and the union agreement provides that de-

fendant is to pay all taxes relating to 'truck operation and use of highways,' the obligation for fuel and highway use taxes falls on defendant." 263 Or at 58.

10. The defendant, however, attempts to distinguish *Asbury* on two main grounds. First, it contends that the lease in *Asbury* referred specifically to federal highway use taxes, while the lease in this case refers only to "highway use taxes." In connection with this attempted distinction the defendant asserts that the federal highway use tax is not a highway use tax but rather is a "tax upon the use of any highway motor vehicle." This contention is without merit. The federal highway use tax, it is true, is a tax on the use of *highway* motor vehicles. 26 USC § 4481. If the trucks do not use the highway, then they are not subject to the tax.

> "An examination of the legislative history [of the federal highway use tax] reinforces the conclusion that in adopting this tax Congress did not intend to tax vehicles of a type not used for highway transportation. * * * [T]he taxes were all related to *highway use,* and their application was deliberately restricted to cases involving *highway use.* * * *." *Rossi v. United States,* 220 F Supp 694, 696 (SD Me 1963). (Emphasis added.)

The federal highway use tax is a highway use tax and is therefore covered by paragraph 4 of the lease.

■ The defendant next contends that the lease in *Asbury* required Consolidated to "bear and pay" the taxes while the collective bargaining agreement in this case requires that the lessee only "pay" the taxes in question. Thus Mitchell Bros. argues that it is entitled to make initial payment of the taxes to the government and then charge back the amount paid to the drivers. This argument is also without merit.

Although the lease in *Asbury* was more precise than the agreements in this case, it is clear from a reading of *Asbury* that the court in no way rested its holding on the fact that that agreement required Consolidated to "bear" as well as "pay" the taxes. "Pay" must be given its usual meaning, that is, to satisfy someone for services rendered or property delivered, or to discharge an obligation. *See* Webster's Third New Int'l Dictionary at 1659 (1965).

We feel that our holding in *Asbury* is controlling in this case, and Mitchell Bros. is responsible for the federal highway use taxes and the federal fuel taxes.

■ Finally, the defendant contends that the plaintiffs are covered by a 90-day limitation clause[@] in the collective bargaining agreement. Thus, any money claims not submitted in writing to Mitchell Bros. within 90 days must be deemed waived. An examination of Article VIII, relating to grievances in general, and its relationship to Article XXXI, § 18, relating to grievances between owner-operators and the employer, shows that the trial court was correct in holding that "the ninety day clause in the union agreement is not applicable in this case."

---

[@] Article VIII, § 3, provides, in part:
"Section 3.

Money Disputes.

"Any dispute as to the amount of money due any employee under this agreement or any supplement hereto shall be submitted in writing to the Employer or his authorized bargaining representative for investigation and adjustment. Any such dispute not submitted within ninety (90) days of the pay day on which any such amount of money is claimed to have become due shall be deemed waived unless the Employer intentionally conceals the facts from which such dispute arises. This ninety (90) day limitation shall not be applicable if it is in conflict with State or Federal law. * * *"

Article VIII, § 1, sets out the scope of the general grievance procedures:

"ARTICLE VIII

Disputes Procedure

"Section 1.

Disputes.

"All questions, disputes and controversies arising under this agreement or any supplement hereto, or between the parties *as to employer-employee relations* covered by this agreement, shall be adjusted and settled in the manner provided in this Article, *unless otherwise expressly provided in this agreement.*" (Emphasis added.)

First, this dispute does not relate to employer-employee relations. Although the plaintiffs are employees, their claims arise from the lease agreements. Thus, the claims relate to lessor-lessee relations.

Second, as § 1 above notes, the general grievance procedures are applicable "unless otherwise expressly provided in this agreement." Article XXXI, § 18, makes a separate express provision to cover grievances between owner-operators and the employer.[20] There is no 90-day limitation period in this section.

■ The plaintiffs allege that the trial court erred when it held that the plaintiffs had not satisfied the conditions required to receive the safety bonus and that no agreement had been reached with regard to the permit load bonus.

The trial court found that a bonus of three-fourths of a cent per mile would be paid in a one-year period, provided the driver did not have claims charged to him that aggregated more than $250 in the period.

---

[20] See footnote [9].

Plaintiffs contend that "claims" mean only cargo damage claims, while defendant contends that "claims" mean all claims, regardless of fault, must be considered.

There was a conflict in the testimony on this point and the trial judge, acting as trier of fact, found for the defendant. We will not disturb this finding on appeal. *Honeywell, Admx. v. Turner,* 214 Or 700, 332 P2d 638 (1958).

With regard to the safety bonus the trial court found that, at the July 1969 meeting the plaintiffs had demanded 10 cents per mile, while the defendant would agree to no more than 3 and 1/3 cents per mile. The court found that no agreement was reached. Again, we will not disturb this finding on appeal. *Honeywell, Admx. v. Turner,* supra.

Affirmed.